1   MARTIN D. BERN (SBN 153203)
    Martin.Bern@mto.com
2   MALCOLM A. HEINICKE (SBN 194174)
    Malcolm.Heinicke@mto.com
3   YUVAL MILLER (SBN 243492)
    Yuval.Miller@mto.com
4   MUNGER, TOLLES & OLSON LLP
    560 Mission Street, Twenty-Seventh Floor
5   San Francisco, CA  94105-2907
    Telephone:    (415) 512-4000
6   Facsimile:    (415) 512-4077

7   Attorneys for Defendant
    GUARDSMARK, LLC

8
                    UNITED STATES DISTRICT COURT
9
                  NORTHERN DISTRICT OF CALIFORNIA
10
                     (SAN FRANCISCO DIVISION)
11

12

13  PHILLIP TEMPLE, on behalf of himself,          CASE NO.  CV-09-2124-SI
    individually, and all others similarly
14  situated,                                      **DECLARATION OF RAMONA MARTIN
                                                   IN SUPPORT OF DEFENDANT
                    Plaintiff,                     GUARDSMARK, LLC'S MOTION FOR
15                                                 PARTIAL SUMMARY JUDGMENT**
16          vs.
                                                   Judge:      The Honorable Susan Illston
17  GUARDSMARK, LLC, and DOES 1                    Date:       December 18, 2009
    through 100, INCLUSIVE,                        Time:       9:00 a.m.
18                                                 Location:   Courtroom 10, 19th Floor
                    Defendant.
19

20

21

22

23

24

25

26

27

28

1      I, Ramona Martin, declare as follows:

2          1.      I have been employed by Guardsmark, LLC (herein "Guardsmark") as

3  Vice President, Human Resources Services Manager since its creation on November 6, 2002, and

4  I have held the same positions with its predecessor, Guardsmark, Inc. since 2000.  I am familiar

5  with Guardsmark's operations and employment policies as well as the manner in which those

6  policies and practices are generally implemented in and tailored to California.  The facts set forth

7  herein are known to me personally, and, if called as a witness, I could and would testify

8  competently thereto.

9          2.      Phillip Temple worked as a security guard for Guardsmark from July 27,

10  2003 to February 27, 2008.  Attached hereto as Exhibit A is a true and correct copy of the

11  employment agreement between Guardsmark and Mr. Temple, executed on July 27, 2003, as

12  contained in Guardsmark's personnel materials for Mr. Temple.  Guardsmark, as a policy, never

13  changes the at-will status of its security officer employees, and there is nothing in Mr. Temple's

14  file to suggest the at-will nature of his employment (as established by Paragraph 1 of his

15  employment agreement) was ever changed.

16          3.      At all times during Mr. Temple's employment, California security officers

17  like Mr. Temple were instructed to wear a basic uniform when on duty, usually consisting of a

18  blazer, slacks, and a white shirt.  At all times during Mr. Temple's employment, Guardsmark

19  provided these uniform items to California security officers at no cost, and agreed to replace them

20  at no cost to security officers as reasonably necessary due to normal wear and tear.  Guardsmark

21  also instructed its security guards, including Mr. Temple, to keep their uniforms clean and

22  presentable, and at all times during Mr. Temple's employment Guardsmark provided an

23  allowance for such uniform maintenance.

24          4.      When Mr. Temple began his employment with Guardsmark in 2003, it was

25  Guardsmark's nationwide policy to include (but not specifically itemize) the funds for uniform

26  maintenance in the employee's overall pay rate.  Guardsmark expressly advised security officers

27  of this fact in Guardsmark's policy document, entitled General Orders, Regulations and

28  Instructions for Uniformed Personnel: "Each security officer and supervisor must ensure that his

DECL. OF RAMONA MARTIN;
CASE NO. CV-09-2124-SI

1  or her uniform is clean and presentable at all times. Your hourly wage rate has been specifically
2  computed to include a percentage of your pay to offset this expense." (Mr. Temple's
3  employment agreement confirms receipt of this document as set forth in Exhibit B, Paragraph 2.)
4  Because the uniform maintenance payment was built into the hourly wage rate, it was not
5  separately or specifically itemized on the pay stubs that Mr. Temple (and others) received in
6  California in 2003.

7       5.     Attached hereto as Exhibit B is a true and correct copy of a letter dated
8  November 14, 2004, from Guardsmark Vice President and Manager of Human Resources Robert
9  W. Overman, Ph.D that Guardsmark sent individually to all Guardsmark security officers in
10  California at their respective home addresses notifying them of the change described in the letter.

11       6.     Attached hereto as Exhibit C is a true and correct copy of Article 15 of the
12  collective bargaining agreement currently in effect between the Service Employees International
13  Union (SEIU) and Guardsmark, effective from December 12, 2007 through December 31, 2012.

14       7.     I have reviewed Mr. Temple's payroll records and they reveal that he was
15  paid a single hourly wage rate of $11.00 immediately prior to the pay period commencing on
16  November 14, 2004. Beginning on November 14, 2004, Guardsmark paid Mr. Temple: (1) a
17  standard hourly wage rate of $10.75; and (2) a separately itemized uniform maintenance
18  allowance payment of twenty-five cents per hour. Mr. Temple received this separately stated
19  uniform maintenance allowance (itemized on his paystubs) for the remainder of his employment,
20  and his base hourly wage rate was never lowered below $10.75.

21       I declare under penalty of perjury under the laws of the United States of America
22  and the State of California that the foregoing is true and correct.

23       Executed this 10th day of November, 2009, in Memphis, Tennessee.

24

25                                           RAMONA MARTIN
26

27

28

                       - 2 -                     DECL. OF RAMONA MARTIN.

# EXHIBIT A

# GUARDSMARK·

Your application for employment will be processed with due diligence. Upon completion of your preliminary background investigation and receipt of temporary clearance, you will be notified to report for issuance of uniforms, insignias, identification badges and other Guardsmark equipment. Upon acceptance, you will be required to sign the following Employment Agreement. The Agreement shall not become binding upon Guardsmark until reviewed and approved by the Selection Controller in Guardsmark's Inspection, Regulatory and Compliance (IRC) Division at Guardsmark's Headquarters. At Guardsmark's option, you may be permitted to commence work prior to receipt of such final approval.

## EMPLOYMENT AGREEMENT

This Agreement made and entered into as of the ___ day of _____, 20 ___, by and between Guardsmark, L.L.C., a Delaware Limited Liability Company (hereinafter referred to as "GUARDSMARK") and _____ (hereinafter sometimes referred to as the "Employee").

WHEREAS, GUARDSMARK is engaged in business as a security service in the conduct of which it receives information of a confidential nature for its clients; and WHEREAS, in the conduct of its business GUARDSMARK has of a necessity established procedures, systems, techniques, forms, methods, aids and materials, records and lists of its clients; and WHEREAS, because of the nature of GUARDSMARK'S business it is necessary and essential that all of these matters remain confidential; and WHEREAS, the voluntary termination of employment with GUARDSMARK by the Employee without adequate notice thereof would seriously jeopardize the security GUARDSMARK provides those of its clients to whose account or accounts Employee is assigned by virtue of the security gap such action would create and GUARDSMARK'S obligation to immediately fill such gap, as well as the difficulty in obtaining a qualified replacement for Employee with the necessary skills and experience, all of which would directly and proximately result in a loss to GUARDSMARK;

NOW, THEREFORE, in consideration of the foregoing and his (her) employment by GUARDSMARK, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Employee, Employee and GUARDSMARK do hereby agree, covenant, and warrant as follows:

1. YOUR EMPLOYMENT IS AT WILL. None of the provisions in the Employment Application and no other written or verbal representation should be considered or construed as establishing a contract or guarantee of employment for any specified period of time. EMPLOYEE AND THE COMPANY UNDERSTAND THAT EACH HAS THE RIGHT TO TERMINATE THIS AT WILL RELATIONSHIP AT ANY TIME, WITH OR WITHOUT CAUSE. Any offer of employment is conditioned upon undergoing a medical examination the results of which show that you can perform the essential functions of the job, with or without reasonable accommodation, without posing a direct threat to the health or safety of yourself or others and upon the results of a background investigation to determine your suitability for employment.

2. Employee hereby agrees to abide by the <u>General Orders, Regulations and Instructions for Uniformed Personnel</u> (GOR&I), copy no. _____84704_____, which has been issued to him (her) and any amendment thereto issued during the course of Employee's employment. Said GOR&I and all amendments thereto are hereby incorporated by reference.

3. Employee acknowledges that all insignias, including badges and patches, uniforms, equipment, identification cards and other property furnished Employee by GUARDSMARK at its expense are the property of GUARDSMARK and Employee agrees that upon termination of employment, whether voluntary or involuntary, he (she) will return all such property to GUARDSMARK within 24 hours of such termination. Further, Employee agrees that all such property will be worn or utilized only while on duty or in transit to and from duty. Employee will immediately report the loss of any property to GUARDSMARK. Employee agrees that no GUARDSMARK property will be given or loaned to any other individual.

4. Employee acknowledges that he (she) has authorized GUARDSMARK to undertake to investigate Employee's background to determine his (her) suitability for employment by it and understands that any false or misleading information contained on his (her) application for employment shall be grounds for immediate dismissal at any time during Employee's tenure with GUARDSMARK.

5. In the event Employee terminates and fails to return all GUARDSMARK property issued to him (her) within the time provided in Paragraph 3 above, Employee hereby grants GUARDSMARK the right to withhold for its own use and benefit any sums due Employee for services rendered, vacation pay accrued, or funds otherwise in GUARDSMARK'S possession. GUARDSMARK agrees that all funds held pursuant to this paragraph shall be held as security for the return of GUARDSMARK property issued to Employee and shall be tendered to Employee upon the return to GUARDSMARK of such property. Employee shall forfeit all right to such security thirty (30) days after termination whether or not said property is returned. Forfeiture of such funds shall in no way be deemed liquidated damages and title to such property shall at all times remain vested in GUARDSMARK.

24

6. GUARDSMARK and Employee agree that Employee shall be employed at an hourly rate, which rate shall be listed upon the payroll records in Employee's supervisor's office. Such records will be available to Employee for his (her) inspection upon request at reasonable and convenient times. It is GUARDSMARK's policy to compensate its employees for all time worked. Employee must record daily on his (her) Weekly Time Record the exact times he (she) starts and completes work and sign it weekly. GUARDSMARK will rely on those records to pay Employee. Employee agrees and understands that, regardless of how well-intentioned, reporting to the premises or facilities of a client prior to scheduled starting time or remaining after scheduled quitting time is expressly forbidden by GUARDSMARK. It is specifically understood and agreed that, except under the circumstances set forth by the GOR&I Employee agrees to work only the hours he (she) is scheduled to work. It is also specifically understood and agreed that (i) the undersigned shall not be considered an employee of GUARDSMARK until his (her) successful completion of GUARDSMARK'S employment application procedures, including but not limited to the successful completion of all training required prior to assignment to the premises or facilities of a client of GUARDSMARK, (ii) no compensation will be payable to the undersigned, whether or not he (she) is ultimately employed by GUARDSMARK, for the time incurred by the undersigned in completing GUARDSMARK'S employment application procedures, including but not limited to such training and/or medical or physical fitness evaluations and (iii) compensation will only be payable to the undersigned commencing upon the undersigned's reporting, in proper uniform, to the premises or facilities of a client designated by GUARDSMARK

7. Employee agrees, upon request of GUARDSMARK, to submit to physical fitness testing, hearing examinations, vision examinations, medical examinations, drug and/or alcohol screening tests, as frequently and at such reasonable times as may be requested by GUARDSMARK to the maximum extent permissible under applicable law. Employee also agrees either to (i) submit to Hepatitis B vaccination series deemed by GUARDSMARK to be required for the assignment to be offered under OSHA Bloodborne Pathogen Regulations or (ii) if Employee does not wish to submit to the vaccination series, if for any reason the vaccination series is not taken or if the vaccination series does not produce antibodies to the Hepatitis B virus, accept transfer to another assignment designated by GUARDSMARK, which other assignment may or may not be at the same rate of pay, shift assignment or other benefits of employment and which will have its own working conditions and exposures. Employee further agrees to reimburse, save harmless and indemnify GUARDSMARK and/or its clients from any loss and expense, including without limitation, attorneys' fees, that either or both may suffer due to Employee's taking part in any illegal act connected with his (her) employment, or due to his (her) not immediately reporting knowledge of any illegal act connected with his (her) employment to a responsible officer of GUARDSMARK.

8. (a) Employee hereby agrees that following his (her) termination of employment with GUARDSMARK, whether voluntary or involuntary, for a period of one year thereafter he (she) will not perform or hire others to perform any security services at the site, place or location where he (she) performed security services within the immediate preceding twelve (12) months of his (her) employment with GUARDSMARK'.

(b) Employee hereby agrees that following the termination of employment with GUARDSMARK whether voluntary or involuntary, for a period of one year thereafter he (she) will not accept employment with or become employed by, or perform any service as or for an independent contractor or otherwise for, a client or former client of GUARDSMARK for whom the employee has provided his (her) service as an employee of GUARDSMARK'.

(c) During employment and following termination, Employee agrees not to take, use or disclose any confidential information of GUARDSMARK for any purpose other than as is necessary for the performance of his (her) duties as assigned by GUARDSMARK, and Employee agrees to maintain the confidentiality of such information. Specifically, Employee shall not disclose to or use such confidential information for the benefit of any competitor of GUARDSMARK or for the benefit of any former client of GUARDSMARK. Such confidential information includes, but is not limited to, personnel information regarding the Company's employees, Company learning and development programs, processes and procedures, Mission Partnership Statement* documents, the General Orders, Regulations and Instructions, staffing strategies, security procedures, customer lists and price, cost or wage or any similar information.

(d) During employment and for a period of one (1) year following termination of employment, (i) Employee agrees not to induce, solicit, request, recruit or aid any other employee of GUARDSMARK to leave GUARDSMARK to work for any other employer, including, but not limited to, competitors of GUARDSMARK or current or former clients of GUARDSMARK, and (ii) Employee also agrees not to aid any other employer including any competitor of GUARDSMARK to induce, solicit, request, recruit or aid any other employee of GUARDSMARK to leave GUARDSMARK to work for them.

(e) Employee agrees that while in the employ of GUARDSMARK, he (she) will not directly or indirectly perform services for any client of GUARDSMARK whether as an employee or independent contractor of such client or otherwise, except as specifically authorized or directed by GUARDSMARK in his (her) capacity as an employee of GUARDSMARK. Because of the immediate and irreparable harm which GUARDSMARK will incur in the event of any breach of the provisions of subparagraphs (a), (b), (c), (d) or (e) of this paragraph 8, such provision may be enforced by an injunction by any court of competent jurisdiction, and GUARDSMARK may, in addition to injunctive relief, seek damages for any breach of such provision.

1 Sections 8(a) and 8(b) have been held to be unenforceable under California Business and Professions Code section 16600 which specific law applies only in that state and in no other state in the United States of America.

25

9. Employee hereby grants GUARDSMARK the right at any time during or after the termination of Employee's employment to furnish to others information concerning his (her) employment record with the company, including but not limited to information contained in the employment application.

10. Unless otherwise stated in writing, security personnel employed by this Branch Office are not employed as armed personnel, will not receive any training with respect to the use of weapons, and SHALL NOT BEAR WEAPONS OF ANY KIND NOR TRANSPORT ANY WEAPON TO OR FROM ANY POST OR ASSIGNMENT. Any violation of this prohibition shall be cause for immediate termination of employment. (The term "weapons" shall include, but not be limited to, knives, daggers, handguns, shotguns, rifles, mace and other chemical devices, leaded or unleaded nightsticks not furnished by GUARDSMARK, blackjacks, brass knuckles, chains, and any and all other similar devices or instruments.)

11. Employee agrees that he (she) will comply with all policies, orders, rules and regulations of GUARDSMARK as in effect from time to time. Further, Employee understands and agrees that his (her) failure to accept an assignment shall be considered grounds for termination of employment and that no promises or guarantees have been made to him (her) concerning hours of employment or stations of duty. Employee understands that he (she) will likely be assigned to different clients, and facilities, and to different shifts, and posts from time to time during the course of employment.

12. Employee agrees to comply with all applicable laws, statutes, ordinances, policies, orders, rules, regulations and procedures relating to employee health, safety and welfare (collectively "Safety Rules"), whether such Safety Rules are promulgated by federal, state or local government, GUARDSMARK and/or its client. GUARDSMARK and client Safety Rules may be found in, among other places, the GOR&I, GUARDSMARK safety training materials, and the Mission Partnership Statement® documents applicable to each client facility served by GUARDSMARK. Employee understands that failure or refusal to comply with such Safety Rules may result in disciplinary action up to and including termination of employment, and that Employee may also be denied workers' compensation or similar benefits if he (she) suffers a work-related injury or illness as a result of the employee's willful or intentional misconduct and/or failure or refusal to comply with such Safety Rules.

13. Employee understands that he (she) will be assigned to the premises or facilities of one or more clients of GUARDSMARK, and in consideration of such assignment(s) *hereby waives any and all causes of action which Employee may have against such client(s) arising out of or in connection with such assignment(s).*

14. Employee agrees and understands that failure to properly complete Daily Reports that will agree with the employee's Weekly Time Record may be cause for GUARDSMARK to withhold reimbursement to the Employee for that period.

15. Employee hereby swears and affirms that he (she) has not paid nor promised to pay or deliver to anyone any money or services or anything else of value in order to obtain employment with GUARDSMARK.

16. Employee hereby acknowledges that he (she) is aware of GUARDSMARK'S published policies as reprinted in this form forbidding unlawful discrimination and sexual harassment and form of the procedures and form for reporting instances of such prohibited conduct; and Employee further understands that any acts of unlawful discrimination or sexual harassment on his (her) part are both against company policy and unlawful, and that engaging in such prohibited conduct will result in disciplinary action, up to and including termination of employment, and may also result in financial liability and other sanctions. Accordingly, Employee represents and agrees not to engage in any conduct which is or may be deemed to be unlawful discrimination or sexual harassment and not to falsely accuse others in the workplace of sexual harassment. Employee understands that our Code of Ethics expressly provides: "Never accept any gifts or gratuities for your work." As a condition of employment, employee must agree to abide by this at all times. Employee further agrees fully and completely to indemnify and hold harmless GUARDSMARK from and against all liability, losses, demands, judgments, costs and expenses (including reasonable attorney's fees) arising out of any incidents of alleged sexual harassment by Employee. Employee fully understands that his (her) representations and agreements herein are made in consideration and as a condition of his (her) employment by GUARDSMARK.

17. Employee agrees that during the term of his (her) employment and for a period of twelve (12) months following termination for any reason of said employment, employee will not disparage GUARDSMARK, any trademark owned by GUARDSMARK, the GUARDSMARK internet website, and products or services of GUARDSMARK, or any of its officers, directors, employees or agents.

18. This Agreement shall be binding upon GUARDSMARK, its successors and assigns, and upon Employee and his (her) heirs, executors, and administrators. This Agreement replaces any previous agreement relating to the same or similar subject matter which Employee may have entered into with GUARDSMARK with respect to his (her) employment by GUARDSMARK. This Agreement may not be changed in any detail by any verbal statement, representation, or other agreement made by any other GUARDSMARK employee or by any written document signed by any GUARDSMARK employee other than a GUARDSMARK officer.

26

19. In the event of any legal proceeding between the parties hereto, except for charges or claims filed with the Equal Employment Opportunity Commission or under any of the statutes enforced by said agency, GUARDSMARK shall be entitled to payment from Employee of all expenses and costs of litigation and reasonable attorneys' fees if GUARDSMARK shall be the party substantially prevailing in such action or proceeding. The invalidity or unenforceability of any provision of this Agreement or any part thereof shall in no way affect the validity or enforceability of any other provision or section of this Agreement. Except for charges or claims filed with the Equal Employment Opportunity Commission or under any of the statutes enforced by said agency, any legal action or proceeding relating to or arising out of this Agreement or the employment of Employee by GUARDSMARK must be brought by Employee within six months of the date the cause of action arose or it shall be time-barred. Except for charges or claims filed with the Equal Employment Opportunity Commission or under any of the statutes enforced by said agency, each party hereby consents to the jurisdiction and venue of the U.S. District Court for the Western District of Tennessee and any court of the State of Tennessee in any action, suit, or proceeding arising out of or relating to this Agreement or the employment of Employee hereunder and agrees further that service of process or notice in any such action, suit or proceeding shall be effective if in writing and sent by U.S. registered or certified mail, return receipt requested, postage prepaid to the party upon whom service is sought. Employee understands that his (her) obligations under this Agreement will continue whether or not employment with GUARDSMARK is terminated voluntarily or involuntarily, or with or without cause. The law of the State of Tennessee will govern the interpretation, validity, and effect of this Agreement, without regard to the place of making or the place of performance or the laws or rules relating to choice of law or conflict-of-laws.

GUARDSMARK

By: _____

Date: _____
Signature and Title

By: _____ (EMPLOYEE)

Date: _____

Witnessed: _____ **GINGER JAMIAS**
_____ HR Specialist

---

# GUARDSMARK·

## MEAL PERIODS AGREEMENT

**Industrial Welfare Commission Order No. 4-2000 contains the following statement regarding meal periods:**

No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than thirty (30) minutes, except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of the employer and employee. Unless the employee is relieved of all duty during a thirty (30) minute meal period, the meal period shall be considered an "on duty" meal period and counted as time worked. An "on duty" meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to.

I have read the above statement, and I agree that due to the nature of my employment as a Security Officer, at times I cannot be relieved of all duty during a meal period. I agree that when this occurs, such meal periods will be "on duty" meal periods and considered as on-the-job paid meal periods. I understand that I may, in writing, revoke this agreement at any time.

GUARDSMARK

By: _____

Date: _____
Signature and Title

By: _____ (EMPLOYEE)

Date: _____

Witnessed: _____ **GINGER JAMIAS**
_____ HR Specialist

27

# EXHIBIT B

November 14, 2004


Dear {Branch Name} Security Officer:

Throughout Guardsmark's history, our average wage paid leads the industry.  Consistent
with Federal guidelines, your hourly wage rate has always included a uniform maintenance
allowance.   For each hour paid, you receive an allowance for maintaining your uniform.
This information is provided in your " General Orders, Regulations & Instructions GOR&I)"
as set forth on page 158. The "GOR&I" and "Guardsmark Means This To You" (page 11)
explain the compensation you receive for your uniform maintenance.

 In order to comply with additional requirements imposed by the State of California,
effective with the pay period beginning November 14, 2004, your uniform maintenance
allowance will be listed separately on your pay statement rather than being in your hourly
wage rate.  The uniform maintenance allowance is $0.25 per hour, and the amount stated in
your hourly wage rate will be reduced by $0.25 per hour  - **the total amount you receive
per hour worked remains the same.**  This will not result in any change in pay for hours
worked, since the sum of your new hourly pay rate plus your separately stated uniform
maintenance allowance will equal your current hourly pay rate.

Separately stating your uniform maintenance allowance will not affect your taxes.  The
uniform maintenance allowance will be paid for all hours worked but not on vacation time.

This change will provide a clearer picture of your compensation and enable you to see in
greater detail the amount received for your uniform maintenance allowance.  Please contact
your manager if you have any questions regarding the change to your pay statement.

Sincerely,


Robert W. Overman, Ph.D.
Vice President
Manager, Human Resources

# EXHIBIT C

# SAN FRANCISCO BAY AREA MASTER
## COLLECTIVE BARGAINING AGREEMENT

**Between**

**Guardsmark, LLC**

**and**

**Service Employees International Union (SEIU)
Local 24/7**

**Effective**

**December 12, 2007**

**Through**

**December 31, 2012**

14.4    In order to qualify for holiday pay, employees must work their last regularly scheduled shifts
        before the holiday and their next regularly scheduled shifts following the holiday, provided,
        that employees who are absent on one (1) or more such days due to approved vacation or sick
        leave shall be entitled to holiday pay, and provided further, that employees who are absent on
        one or both of such days due to FMLA leave, or medical leave or personal leave previously
        approved by the Company, shall be entitled to receive holiday pay only upon their return to
        active employment.

14.5    Employees scheduled to work on a holiday who do not report for work and fail to call in prior
        to their starting time shall not be eligible to receive holiday pay.  Any employee who takes an
        extra day off in connection with the holidays provided for in this Article for reasons not
        justified, shall be subject to progressive discipline by the Company.

14.6    On state and national general election days, the work shall be arranged so as to allow the
        employees time to vote without loss of pay.

14.7    The Company will make every effort to schedule work for any full-time employee who
        requests it, whose regular shift is cancelled on a holiday.

14.8    The first eight (8) hours of work performed at the holiday overtime rate shall be considered
        straight time in determining when overtime shall become payable under the Fair Labor
        Standards Act.  Payment of overtime for holidays worked shall not relieve the Company from
        payment of overtime for hours worked in excess of forty (40) hours a week or eight (8) hours a
        shift as provided in Article 12.  There shall be no pyramiding of premium or overtime pay for
        the same hours worked.

### ARTICLE 15
### UNIFORMS

15.1    All uniforms and equipment as required shall be furnished by the Company without cost to the
        employee.  The Company will determine its own requirements as to uniform and those items
        specifically required by the Company will be furnished by it.

16

15.2    The Union recognizes that such uniforms are a cost to the Company and must be returned at time of termination. The mechanics of withholding a deposit or retainer by the Company are at the Company's and employee's mutual agreement, the sum not to exceed one-hundred twenty-five dollars ($125.00) for all employees.

15.3    Where special equipment such as firearms is supplied, a deposit may be required of the employee. The amount of such deposit shall be negotiated by the Company and the Union. Uniform deposits shall be returned to the employee upon termination, provided that such uniforms, apparel, and equipment are returned in reasonable condition (reasonable wear and tear excepted).

15.4    The employee shall have an obligation to purchase and wear black socks, shiny black shoes (unless exempted from the shine requirement by the Company because of the nature of site of work), and a black belt.

15.5    Uniformed employees shall be paid a uniform maintenance allowance of two dollars ($2.00) per day worked unless the Company or the client provides cleaning for the uniform. If a Company presently provides uniform maintenance reimbursement as part of an employee's hourly wage rate, it shall separate such reimbursement payment from the hourly wage rate and show the apportionment on the employee's check stub. In its sole discretion, a Company may pay a uniform maintenance allowance of more than two dollars ($2.00) per day worked.

### ARTICLE 16
### FARES AND TRAVEL

16.1    A reporting allowance shall be paid by the Company in accordance with the following:

   (a) During work hours, employees will not be required to use their personally owned vehicle for any reason at any time.

   (b) An employee residing in the City and County of San Francisco will not be compelled to accept work assignments outside of the city and county of San Francisco.

   (c) When an employee voluntarily accepts a special assignment outside of the city and county of San Francisco, the employee shall be paid IRS Rate per mile plus tolls required to reach such assignments from the normal assigned location or the appropriate reimbursement for the transportation chosen by the employee.

17